KNOLL, Judge.
Linda Dennison appeals the trial court’s judgment granting her a divorce a vinculo matrimonii against her husband, Dennis Bundick, contending that the trial court erred in finding mutual fault and in reducing the child support for their two minor children from $950 per month to $400 per month per child. We amend and affirm, *460 finding: (1) no manifest error in the trial court’s determination of fault; and (2) the record does not support a sufficient change of circumstances to modify the original child support award.
FACTS
Linda Dennison and Dennis Bundick physically separated in December 1983 after eleven years of marriage. Two children were born of the marriage, namely Brady and Lauren, ages twelve and five respectively. In January 1984, Bundick filed a petition for separation based on his wife’s alleged cruel treatment. Dennison filed an answer denying the allegations of cruel treatment and reconvened seeking an immediate divorce based on Bundick’s post-separation adultery. Pending trial of the merits, judgment on the rules nisi awarded Dennison the temporary care, custody and control of the minor children, and ordered Bundick to. pay $950 per month child support, plus maintaining hospitalization insurance coverage for the minor children. Pri- or to trial the parties stipulated that Denni-son was entitled to a divorce based on Bundick’s adultery. After trial on the merits, the court found neither party was free from fault within the meaning of LSA-C.C. Art. 160 and reduced Bundick’s child support obligation from $950 per month to $400 per month per child, with a continuing obligation to maintain hospitalization insurance coverage for the two minor children. The court further ordered implementation of a joint custody plan.
MUTUAL FAULT
C.C. Art. 160 provides in pertinent part:
“When a spouse has not been at fault and has not sufficient means for support, the court may allow that spouse, out of the property and earnings of the other spouse, permanent periodic alimony ...”
When a spouse claims entitlement to permanent alimony, he or she bears the burden of proving freedom from fault in the breakup of the marriage. The meaning of fault within the context of C.C. Art. 160 is not synonymous with being totally blameless in the marital discord. Slaughter v. Slaughter, 436 So.2d 1352 (La.App. 3rd Cir.1983). To constitute fault, a spouse’s misconduct must not only be of a serious nature but must also be an independent contributory or proximate cause of the separation. Pearce v. Pearce, 348 So.2d 75 (La.1977); Kendrick v. Kendrick, 236 La. 34, 106 So.2d 707 (1958).
When determining alimony under C.C. Art. 160, the question of a spouse’s fault is a factual issue. Souza v. Souza, 428 So.2d 1204 (La.App. 5th Cir.1983); Pearce v. Pearce, supra. Appellate courts have consistently recognized that a trial court’s findings of fact on the issue of a spouse’s fault will not be disturbed on appeal unless found to be clearly wrong. The trial judge is accorded much discretion in the resolution of domestic litigation and particularly in evaluating the weight of evidence which is to be resolved primarily on the basis of the credibility of witnesses. The trial judge, having observed the demeanor of the witnesses, is in a better position to rule on their credibility. The factual findings of the trial court are, therefore, given very substantial weight on review. Souza, supra; Pearce, supra.
In the instant case the trial court evaluated the aggregate circumstances and, based upon the evidence, found both parties at fault in causing the initial separation. Since Dennison is the only party seeking alimony, we need only determine whether the trial court committed manifest error in finding her sufficiently at fault to preclude a permanent alimony award.
Bundick contends that Dennison’s cruel treatment consisted of: a pattern of mental harassment, nagging and griping; failure to maintain their home in a neat and clean manner; and verbal abuse and open criticism of him to others, all of which caused him mental anguish and great distress. Dennison contends that although she may have been “at fault” in the generic sense of the word, her fault was not of the magnitude contemplated by C.C. Art. 160 *461 sufficient to deprive her of permanent alimony.
In its oral reasons for judgment, the trial court elaborated upon the facts which it considered mutual fault. We quote the court’s reasons, that pertain to Dennison since her freedom from fault is at issue: “In considering the initial separation, I have watched the witnesses. I have listened to them, particularly observing the temper of the voice, the manner of testifying; and I am applying that factor of credibility in this ruling.

“Doctor Calamia testified that he could not certify Mrs. Bundick [Dennison] was disabled. That he felt that she could work. That she had very bad days. That her condition would permit her to do homemaking tasks. And he made reservation with periods of flare.

“Mr. Bundick testified that, with respect to the initial separation, that Mrs. Bun-dick was a very .bad housekeeper. That even with psychological counseling, there was no improvement. He further testified that Mrs. Bundick did have good relation with the children, except for a certain lack of patience, citing on one (1) occasion, according to his testimony, that Brady, the eleven-year-old, had a hand-print on his face where Mrs. Bundick had struck him. That after work, on a farely [sic] regular basis, he would have to do housework. That Mrs. Bundick still fussed because he had [not] done it right, or had not done enough.

“Although there was an accident, — in February, 1978, I think the■ date was— that whatever she wanted to do, she did and whatever she did not want to do, she did not do. For a while she worked at the drugstore. They had received certain funds as a result of the accident. From those funds, Mrs. Bundick herself has admitted that she gave her father twenty thousand dollars ($20,000.00), paid eighteen thousand dollars ($18,000.00) for a private investigator, which, of course, was her right.
“That Mr. Bundick further testified that Mrs. Bundick would become upset when he did not include her in all his business meetings, his business meals, things of this nature. That she wanted him to come home early and stay at home for the purpose of doing housework. That she constantly gave him a hard time. That he tried to change the situation, but he could not. That their child had excessive absences which might, as of that date, — and I have not heard it verified at this point today, — [have] caused him to repeat a school grade.
⅜ ⅜ ⅜ 9f« % #
“Now Mr. Bundick’s testimony with respect to the inadequate and unacceptable housekeeping practices was substantiated by the testimony of Emily Toups, who testified that she was hired to do housework for the Bundicks one (1) day a week, on Friday. That she worked there two (2) or three (3) months, April and May. That she and her sister-in-law would do the job together. She testified, substantiating what Mr. Bundick says, that the house was always messy — messed up when she came. Saying, in effect, that ‘It was pretty bad every time we’d go. ’ Pretty bad, compared to other homes worked in. There were unwashed dishes, some even with food still on them. That the house wasn’t really dirty though. It was not picked up.
* sfe * sjc sfc *

“The next witness, Mrs. Mary Rowe, the wife of Jan Rowe, the law partner of Mr. Bundick, testified that the house was a messy house, that it was not clean nor orderly. That when persons arrived and were expected, it was neat. Normally, on a girl-to-girl visit, she would find the house messy. That Mrs. Bundick did complain to her about Mr. Bundick. That Mrs. Bundick indicated she felt the housework was fifty percent (50%) the responsibility for Mr. Bundick. She said that Mrs. Bundick said that she was not going to do the housework, that she was tired, she just didn’t feel like doing it and was not going to do it.

“Sometimes, Mrs. Bundick would get her on the phone for a long time and complain. Mrs. Bundick told her that she *462 apparently felt that a husband had things to do at home, before he went off to golf on the days that they were golfing— games played by the husband; and that Mrs. Bundick became upset because he would play on Sunday, but would not go to church. That Mrs. Bundick was greatly involved in church.

“Mrs. Bundick complained about Mr. Bundick’s income. That the testimony about the bedspread incident. That Mrs. Bundick bought a bedspread for two hundred and fifty dollars ($250.00), where Mr. Bundick made her return, which upset Mrs. Bundick.

“Mrs. Bundick has been buying clothes and jewelry after Mr. Bundick left, saying that she would continue to dress in the way she was accustomed to. Mrs. Rowe said that Mrs. Bundick did not do this when she was with Mr. Bundick, ...

* * ⅝: * ⅝ m
“That Mrs. Bundick, according to this witness, would oversleep. And when the weather was bad, she would not take the children to school. That, on occasion, on the telephone, that Mrs. Bundick would say she was still in her nightgown, at a time when one (1) is normally not — when one (1) is normally no longer in night dress. That Mrs. Bundick would call Mr. Bundick to bring home supper, that she was too tired to cook.

“Mrs. Rowe testified that she never saw Mr. Bundick mistreat Mrs. Bundick. Mrs. Bundick said that she did not like to spank the son because she is afraid she’d lose control. And that one (1) time, Mrs. Bundick complained that she had beat the son with the fly swatter until her arm was sore.

“That with respect to the practice of Mr. Bundick’s night with the son, Mrs. Bun-dick complained, ‘When is my time?’, apparently referring to a desired time for her to spend with Mr. Bundick.

“On cross, the witness testified that she considers Mrs. Bundick a good mother; and that she has left her own children with her and would do so again.

* * * * * *

“The next witness, Mr. William Comeaux, testified that he sold his house, the second house which they purchased, to Mr. and Mrs. Bundick. He’s been well-acquainted with them for approximately seven (7) years. That he is not a member of Mr. Bundick’s firm, but is a sole practitioner. He testified that his own wife was for a time, involved in the relationship, as a friendly relationship.

“Mr. Comeaux testified that when he went to the house, that every time he went to the house, it was a disaster area, I believe was the term he used. That Mrs. Bundick complained that Mr. Bundick was spending too much time at the office. That Mrs. Bundick would not listen to anything that did not agree with her own thinking, which included Mr. Bundick not being able to talk to her. Mrs. Bun-dick always felt that she was right and would not listen to any other view.

“Mrs. Bundick complained that Mr. Bun-dick was not doing his share at home; and that when Mr. Bundick came home, he should take care of the kids so that Mrs. Bundick could do what she wanted. “That this condition became so acute or of such magnitude, that Mr. Comeaux and Mrs. Comeaux actively began to avoid the Bundicks. That Mrs. Bundick became more self-centered. That Mrs. Bundick did not say that her physical condition prevented her from doing housework, but that she had indicated her distaste for it.

⅜ ⅜ sf: ⅜ * *

“Mrs. Bundick testified and her testimony was that her housekeeping, while not the best perhaps, but that she did try to maintain it as livable. That there were no complaints about the clothes. That Mr. Bundick seemed to be in a different world, that she did try. And that he did not complain. He did not praise when it was good, nor did he complain when it was bad. With respect to possible nag
*463
ging, he did not complain about this until after he left.

* * * * * *

“She indicated the monies received in settlement of the accident. She considers herself a good wife. When Mr. Bundick left, she said he told her that he did not love her anymore. She asked him to come back. She suggested counseling. She said that Mr. Bundick said there was nothing she had done, that he just needed to get out. She indicated that she would do anything to preserve the marriage.

“The tenor of Mrs. Bundick’s testimony appears to me to be that Mr. Bundick simply wanted out at this stage, so he up and left, and that there was nothing that she could do to get him to stay, or indeed, after he left, to return.

* * * sf: ⅜ sfc

“She indicated that she felt that she lived without fault, that there was no fault on her part. She would become angry when she would go out to choir practice, after having left supper on the stove for her family, when she would come back and find Mr. Bundick had not cleaned it up, but'that he was sitting in his chair reading or watching television.

* * * * * *

“Now, applying the fact of credibility, I am particularly impressed by the testimony of witness Toups, witness Mam Rowe and witness William Comeaux; and I find that there are certain parts of the testimony of Mrs. Bundick that seem to substantiate the testimony of Mr. Bun-dick as I have indicated.

“Accordingly, I find that with respect to the initial separation, occurring before the facts and circumstances upon which the divorce was based occurred that there was fault on the part of both parties, both Mr. Bundick and of Mrs. Bundick.

“With specific regards to Mrs. Bundick that the maintenance of a house in a state of disaray fsic}, or the lack of adequate housekeeping was in excess. Her complaints, her manifest dissatisfaction with him, her checking up on him at the office and her indications or the indications of testimony that she would not listen to anyone else, but would have her own way. ” (Emphasis added.)

After a careful review of the record, we cannot say that the trial judge was clearly wrong' in finding Dennison at fault nor do we find that he committed manifest error in determining that her fault was sufficient to preclude permanent alimony.
CHILD SUPPORT
LSA-C.C. Art. 227 imposes upon parents a mutual obligation of support, maintenance and education of their children. The amount of support is determined according to the needs of the children as well as the circumstances of those who are obligated to pay it. Dickinson v. Dickinson, 461 So.2d 1184 (La.App. 3d Cir. 1984), writ denied, 465 So.2d 736 (La.1985); Prudhomme v. Prudhomme, 381 So.2d 906 (La.App. 3rd Cir.1980), writ denied, 383 So.2d 782 (La.1980). The trial court is vested with much discretion in granting or modifying awards of child support, and its judgment will not be disturbed on review unless there has been a clear abuse of this discretion or manifest error in its factual appreciations. Dickinson v. Dickinson, supra; LaPorte v. Howell, 452 So.2d 420 (La.App. 3rd Cir.1984).
Children of separated or divorced parents are entitled to be maintained in the same manner as before the separation or divorce. Arceneaux v. Arceneaux, 426 So.2d 745 (La.App. 3rd Cir.1983). Inasmuch as child support awards are not permanent, courts can modify an award for such support where there is demonstrated a change in the needs of the children or in the ability of the father to pay. Dickinson v. Dickinson, supra. It is well settled that the party seeking to modify a judgment awarding child support bears the burden of showing that there has been a change in circumstances of one of the spouses. Laporte v. Howell, supra; Jordan v. Jordan, 432 So.2d 314 (La.App. 5th Cir.1983), writ denied, 438 So.2d 1111 (La.1983).
*464 In the instant case, the trial court decreased the child support award without assigning reasons for the decrease. The record is bare of any evidence of a substantial change in circumstances that would support a modification of the child support award. Absent a showing of a demonstrated change in the needs of the children or the ability of the father to pay, we cannot modify a child support award. Therefore, we amend the judgment of the trial court to reinstate the original child support award in the judgment on the rules nisi granting $950 per month and maintaining hospitalization insurance coverage for the children.
DECREE
For the foregoing reasons, we amend the judgment of the trial court to reinstate the original child support award. Therefore, it is ORDERED, ADJUDGED AND DECREED that Dennis Bundick pay unto Lin-da Dennison child support at the rate of $950 per month for the support of the minor children, Brady Bundick and Lauren Bundick, and further, that Dennis Bundick maintain a policy of hospitalization insurance covering the two minor children. In all other respects, the judgment of the trial court is affirmed.
Costs of this appeal are assessed one-half to Dennis Bundick and one-half to Linda Dennison.
AMENDED AND AS AMENDED AFFIRMED AND RENDERED.